1  DAVID J. STEELE, CA Bar No. 209797
   Email:  djslit@cph.com
2  CHRISTIE, PARKER & HALE, LLP
   18101 Von Karman Avenue, Suite 1950
3  Irvine, CA  92612-0163
   Telephone: (949) 476-0757
4  Facsimile:  (949) 476-8640

5
   HOWARD A. KROLL, CA Bar No. 100981
6  Email:  howard.kroll@cph.com
   CHRISTIE, PARKER & HALE, LLP
7  655 N. Central Avenue, Suite 2300
   Post Office Box 29001
8  Glendale, CA  91209-9001
   Telephone: (626) 795-9900
9  Facsimile: (626) 577-8800

10  Attorneys for Plaintiff
    IMAGE ONLINE DESIGN, INC.
11

12                     UNITED STATES DISTRICT COURT

13                    CENTRAL DISTRICT OF CALIFORNIA

14

15  IMAGE ONLINE DESIGN, INC.,          Case No. CV12-08968DDP(JCx)

16             Plaintiff,

17        vs.                           COMPLAINT FOR BREACH OF
                                        CONTRACT; BREACH OF
18  INTERNET CORPORATION FOR            COVENANT OF GOOD FAITH
    ASSIGNED NAMES AND                  AND FAIR DEALING;
19  NUMBERS,                            TRADEMARK AND SERVICE
                                        MARK INFRINGEMENT;
20             Defendant.               CONTRIBUTORY TRADEMARK
                                        AND SERVICE MARK
21                                      INFRINGEMENT;
                                        INTENTIONAL INTERFERENCE
22                                      WITH CONTRACTUAL
                                        RELATIONS; AND
23                                      INTENTIONAL INTERFERENCE
                                        WITH PROSPECTIVE
24                                      ECONOMIC ADVANTAGE

25
                                        DEMAND FOR TRIAL BY JURY
26

27

28

                                   -1-

1   Plaintiff Image Online Design, Inc. ("IOD"), by and through its attorneys,

2   Christie, Parker & Hale, LLP, files its complaint against Internet Corporation for

3   Assigned Names and Numbers ("ICANN") for injunctive relief and damages as

4   follows:

5   **Subject Matter Jurisdiction and Venue**

6   1.   This case is a civil action arising under the Trademark Laws of the

7   United States, 15 U.S.C. §§ 1051, *et seq.*   This Court has subject matter

8   jurisdiction over the claims in this Complaint which relate to trademark and

9   service mark infringement pursuant to 15 U.S.C. § 1121, and 28 U.S.C. §§ 1331

10   and 1338(a).

11   2.   This Court has supplemental jurisdiction over the claims in this

12   Complaint that arise under state statutory and common law of the State of

13   California pursuant to 28 U.S.C. § 1367(a), because the state law claims are so

14   related to the federal claims that they form part of the same case or controversy

15   and derive from a common nucleus of operative facts.

16   3.   Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(b).   The

17   claims alleged in this action arose in the Central District of California; and,

18   ICANN transacts business in the Central District of California.

19   **Parties and Personal Jurisdiction**

20   4.   Plaintiff IOD is a California corporation with its principal place of

21   business in San Luis Obispo, California.

22   5.   Defendant ICANN is a California non-profit public benefit

23   corporation, with its principal place of business in Marina Del Rey, California,

24   within the Central District of California.

25   **Factual Background - The Internet**

26   6.   The Internet is an international network of interconnected servers

27   and computers.

28   7.   The World Wide Web is a collection of files, or "websites," hosted

-2-

on computers and servers and made available to consumers by the Internet, containing text, graphics, audio and video.

8. Consumers typically access the World Wide Web using a software application known as a browser (e.g. Microsoft Internet Explorer, Apple Safari).

9. Each computer[1] connected to the Internet has a unique identity, established by its Internet Protocol address ("IP Address"). An IP Address consists of four numbers between 0 and 255, separated by periods (e.g. 123.45.67.89). The unique IP Address ensures that users can connect to the computer they intend to communicate with.

10. Because the string of numbers contained in an IP Address is difficult to remember, the Domain Name System ("DNS" or "DNS System") was introduced to allow users to identify a computer using an easier-to-remember alphanumeric name (known as a hostname). The DNS is a hierarchical naming system for computers connected to the Internet. The DNS is often analogized as a phone book for the Internet, translating human-friendly computer hostnames into machine-friendly IP addresses.

11. In the DNS System, each computer is assigned a hostname (e.g., "myhost"), and the computer's hostname exists within a domain name (e.g., "cnn.com"). The complete DNS name for a computer, known as a fully-qualified domain name, consists of the hostname and its parent domain name (e.g., "myhost.cnn.com").

12. The DNS ensures that each unique alphanumeric fully-qualified domain name corresponds to a specific numerical IP Address on the Internet. For example, myhost.cnn.com might resolve to 1.2.3.4.

13. One popular hostname is "www," which is commonly used as the

---

[1] Computer is used throughout this Complaint generically; a computer includes personal computers, webservers or email servers, and other kinds of communication devices attached to the Internet.

CHRISTIE, PARKER & HALE, LLP

1    hostname for a webserver hosting a website.  For example, www.cnn.com is the

2    fully-qualified domain name for the webserver operated by CNN.[2]

3        14.    Domain names are commonly used as part of a Uniform Resource

4    Locator ("URL").   For example, the URL http://www.cnn.com contains the

5    domain name "cnn.com," and the fully-qualified domain name www.cnn.com.

6        15.    Internet users connect to a website by typing a URL (including a

7    domain name) into their browser software.  When an Internet user attempts to

8    connect to a URL, the domain name is sent to one or more DNS servers which

9    "look up" the IP address assigned to the website (i.e., the fully-qualified domain

10   name).  The browser then links to the server having that IP address and which

11   hosts the desired website.

12       16.    Similarly, when an Internet user sends an email the IP address of the

13   recipient's email server is "looked up" using DNS servers so that the email may

14   be delivered.

15       17.    The fields of a fully-qualified domain name are separated by periods

16   and read from right to left.  The alphanumeric field to the far right is the Top

17   Level Domain ("TLD") (e.g., "com"), the field to the left of the TLD is the

18   Second Level Domain ("SLD") (e.g., "cnn").  TLDs are the highest subdivision

19   of Internet domain names.

20       18.    The field (if any) to the left of the SLD could be either a hostname or

21   a Third Level Domain, and so on.[3]  For example, in the URL http://www.cnn.com

22   _____

23   [2] It bears noting that a domain name alone (without a hostname – e.g., "cnn.com")
     may also correspond to a specific numerical IP Address on the Internet.  This
24   functionality permits users to directly navigate to a domain name without typing
25   the "www" (e.g., a user can navigate directly to cnn.com).

26   [3] The DNS system permits additional levels. For example, the Ninth Circuit Court
     of Appeals uses ca9.uscourts.gov for its domain name—a third level domain
27   name;  the  court  webserver's  hostname,  "www,"  is  available  at
28   www.ca9.uscourts.gov.

CHRISTIE, PARKER & HALE, LLP

the TLD is "com," and the SLD is "cnn;" in the example URL, the hostname for the webserver, "www" is to the left of the SLD.

19.    Most TLDs with three or more characters are referred to as "generic" TLDs ("gTLDs").   Common gTLDs include .com, .org, and .biz.   There are currently twenty-two gTLDs.

20.    The organization responsible for operating a particular TLD is referred to as a "registry operator" or "registry."  Registry operators oversee the allocation of SLDs in the TLD, and maintaining a database directory or "zone file" of the allocated SLDs and the respective DNS servers servicing each SLD.

21.    Registries often[4] authorize separate companies, called "registrars," to directly sell the TLD domain names to the ultimate business or consumers owning and using those names in the TLD.  Exa mples of registrars include GoDaddy.com and Network Solutions.  The ultimate owners or users of SLDs are called "registrants."

22.    Registrars like GoDaddy.com and Network Solutions are approved to register SLDs in TLDs.  Registrants, in turn, register domain names through approved registrars and the registrars enter the registered SLDs into the registry's zone file so the SLD can operate.  Registrants pay fees to registrars and registrars, in turn, pay fees to the registries (usually on an annual or other periodic basis) to register domain names within particular TLDs.  The registries for the TLDs in turn pay fees to ICANN, periodically (e.g. quarterly) on a per-registration or per-renewal basis.

/ / /

/ / /

/ / /

---

[4] Some registry operators exclusively sell SLDs in their TLD and do not use registrars.

CHRISTIE, PARKER & HALE, LLP

**Factual Background - ICANN**

23.    ICANN was created in 1998 in response to a policy directive of the United States Department of Commerce ("DoC") to administer the DNS.  ICANN is charged by the DoC with, among other things, exclusive authority to decide which TLDs to approve and select and to enter into agreements with TLD registry operators.

24.    Before ICANN's formation in 1998, overall management of the DNS was carried out under contractual arrangements between the United States Government, which coordinated the development and initially controlled the Internet, and other parties.

25.    In or about 1997, the DoC came under increasing pressure from various governments and users of the Internet to give up all control over the DNS and to privatize management of the DNS.

26.    In 1998, the DoC and ICANN entered into the first of a series of agreements that divested the DoC of control over the DNS and assigned to ICANN overall authority to manage the DNS.   Under those agreements, ICANN's duties include determining what new TLDs to approve, choosing registries for existing or newly approved TLDs, and contracting with the registries to operate the TLDs.  ICANN also has some responsibility over the Internet's primary DNS root system.  The DNS root system is the system of DNS servers that store the authoritative master list of all TLDs.

27.    Although the DoC has through written contracts charged ICANN with such responsibilities, the DoC has no regulatory oversight and no statutory authority to direct ICANN's decisions about, for example, which TLDs to enter into the DNS root system, and which registry operators to select.  In fact, no governmental entity or regulatory scheme governs ICANN's decisions to approve TLDs or registries and ICANN acts as a purely private entity in making such decisions.

CHRISTIE, PARKER & HALE, LLP

28.     According to its Articles of Incorporation, ICANN was established "for the benefit of the Internet industry as a whole."   ICANN's Articles of Incorporation state its purposes as follows: "the Corporation shall . . . pursue the charitable and public purposes of lessening the burdens of government and promoting the global public interest in the operational stability of the Internet by (i) coordinating the assignment of Internet technical parameters as needed to maintain universal connectivity on the Internet; (ii) performing and overseeing functions related to the coordination of the Internet Protocol ('IP') address space; (iii) performing and overseeing functions related to the coordination of the Internet domain name system ('DNS'), including the development of policies for determining the circumstances under which the new top-level domains are added to the DNS root system; (iv) overseeing operation of the authoritative Internet DNS root server system; and (v) engaging in any other related lawful activity in furtherance of items (i) through (iv)."

## Factual Background - IOD

29.     Since 1996, IOD has been engaged and is presently engaged in the business of providing telecommunications services, namely, Internet registry services using the service mark .WEB

30.     Unable to make its .WEB registry services available to consumers using the Internet's primary DNS root system controlled by ICANN, IOD has made its .WEB registry services available via alternate DNS root systems, and to consumers who chose to modify their web browsers to resolve domain names ending in .WEB which have been registered through IOD.  Despite being unable to make its .WEB registry services available to consumers using the Internet's primary DNS root system controlled by ICANN, IOD has registered over 20,000 .WEB domain names.

31.     IOD also offers a wide range of value added services, under its .WEB service mark, complimentary to its registry services, including low cost

CHRISTIE, PARKER & HALE, LLP

DNS services and email forwarding services.

32.     IOD also offers a wide range of other goods and services, under its .WEB trademark and service mark, including online retail store services featuring computer accessories, and computer accessories, to name a few.

33.     IOD's services under the .WEB trademark and service mark are rendered in both interstate commerce and commerce between the United States and foreign countries.

34.     IOD has been careful, skillful and diligent in the conduct of its business. As a result of IOD's efforts, the .WEB trademark and service mark has developed a substantial goodwill which inures to IOD's benefit.

35.     IOD owns a United States Trademark Reg. No. 3,177,334 for its .WEB trademark and service mark.

36.     While the U.S. Patent and Trademark Office ("USPTO") regards TLDs as generally serving no source-indicating function, the USPTO has recognized that "[a]s the number of available TLDs is increased by the Internet Corporation for Assigned Names and Numbers ("ICANN"), or if the nature of new TLDs changes, the examining attorney must consider any potential source-indicating function of the TLD and introduce evidence as to the significance of the TLD." The USPTO has thus explicitly recognized that TLDs could, in fact, serve source-indicating functions.

37.     The USPTO's prior stance on the function of TLDs as generally not being source indicating is a relic of an essentially exclusive ".com."

38.     IOD has acquired common law trademark rights in .WEB and competes with other registries in the gTLD market.

39.     IOD uses .WEB as a trademark and service mark (collectively, the ".WEB Mark"), and not descriptively or generically, in connection with its registry services.

40.     Relevant consumers associate the .WEB Mark as identifying a single source of goods and services being provided by IOD.

### Factual Background - Introduction of New TLDs

41.     On April 19, 2000, ICANN's Domain Name Supporting Organization ("DNSO") recommended that ICANN introduce new TLDs in stages, with "a limited number of new top-level domains . . . introduced initially" followed by the "future introduction of additional top-level domains . . . only after careful evaluation of the initial introduction."

42.     At its Public Board Meeting in Yokohama, Japan on July 16, 2000, ICANN's Board of Directors approved resolutions accepting the recommendations of the DNSO "that a policy be established for the introduction of new TLDs in a measured and responsible manner."   ICANN's Board of Directors resolved that ICANN was "to issue a formal call for proposals by those seeking to sponsor or operate one or more new TLDs, accompanied by a New TLD Registry Application Form, instructions for filling out the application, and a statement of criteria for the Board's eventual decision."

43.     ICANN's amended by-laws, Article IV §1(c), mandate that ICANN "shall not apply its standards, policies, procedures or practices inequitably or single out any particular party for disparate treatment unless justified by substantial and reasonable cause, such as the promotion of effective competition."

44.     ICANN's stated criteria required ICANN and its staff to fairly and competently evaluate each applicant's application.    "The ICANN staff is responsible for gathering information about submitted applications, evaluating the applications and associated information, and makin g recommendations to the Board based on the applications, associated information, and evaluation."

45.     On October 1, 2000, IOD submitted a proposal for the inclusion of the TLD .WEB in the Internet's primary DNS root system controlled by ICANN. ("IOD's .WEB TLD Application").   Under IOD's .WEB TLD Application, IOD

-9-

was to act as the registry operator.   Concurrent with IOD's .WEB TLD Application, IOD paid ICANN a non-refundable fee of $50,000.

46.   On November 16, 2000, ICANN's Board of Directors issued its decision on new TLDs.  ICANN identified seven new TLDs which were selected for "the proof of concept phase."  ICANN did not select .WEB as one of the seven new TLDs.

47.   During the deliberations in 2000, Dr. Vinton Cerf, then the Chairman of ICANN's Board of Directors, stated:  "I'm still interested in IOD.  They've worked with .WEB for some time.  To assign that to someone else given that they're actually functioning makes me uneasy."

48.   On December 15, 2000, IOD filed with ICANN a request for reconsideration (Reconsideration Request 00-13) of IOD's .WEB TLD Application submitted in accord with the ICANN reconsideration policy.

49.   On March 16, 2001, ICANN's Reconsideration Committee responded to Reconsideration Request 00-13 stating:  "it should be clear that *no applications were rejected*; the object was not to pick winners and losers, but to select a limited number of appropriate proposals for a proof of concept. *All of the proposals not selected remain pending, and those submitting them will certainly have the option to have them considered if and when additional TLD selections are made*."  (Emphasis added).

50.   On May 7, 2001, ICANN's Board of Directors adopted ICANN's Reconsideration Recommendation regarding Reconsideration Request 00-13 "for the reasons stated in that recommendation."

51.   In a series of Congressional oversight hearings, held to examine ICANN's new TLD selection, ICANN also promised members of Congress that qualified applications for new TLDs that were bypassed would be reviewed again.  Dr. Cerf testified before the House Commerce Committee that "one of the things that allowed us to I think achieve consensus [on the seven TLDs selected

-10-

on November 16, 2000] was the belief that any of the qualifying TLD applications would, in fact, be considered later."

52.     In June 2008, ICANN's Board of Directors adopted the policy recommendations of ICANN's Generic Names Supporting Organization, which is the successor to the DNSO, for the introduction of new TLDs in rounds and directed its staff to develop detailed implementation plans.

53.     On September 30, 2009, in an Affirmation of Commitments, ICANN reaffirmed its commitments to the DoC that "ICANN will ensure that as it contemplates expanding the top-level domain space, the various issues that are involved (including competition, consumer protection, security, stability and resiliency, malicious abuse issues, sovereignty concerns, and rights protection) will be adequately addressed prior to implementation."

54.     In June 2011, and revised in June 2012, ICANN issued a guidebook for applications for new TLDs.  According to the guidebook, ICANN required a non-refundable deposit of $185,000 for each application.

55.     The first application window for new TLDs opened on January 12, 2012 and closed on May 30, 2012.

56.     IOD did not submit a new application for the .WEB TLD between January 12, 2012 and May 30, 2012 because IOD's .WEB TLD Application was still pending before ICANN.

57.     According to the guidebook, IOD could have received an $86,000 credit toward the $185,000 new application fee, if IOD agreed that " ... [it] has no legal claims arising from the 2000 proof-of-concept process."

58.     On June 13, 2012, even though IOD's .WEB TLD Application was still pending before ICANN, ICANN received seven new applicants to operate the .WEB TLD.

59.     At least two of the new applicants to operate the .WEB TLD (Afilias Limited and Google, Inc.) reflect a conflict of interest with, and prior ties to, ICANN.

60.     For example, Steve Crocker, the current Chairman of ICANN's Board of Directors, runs the consulting firm Shinkuro, Inc. which has an investment from Afilias Limited, the owner of .org and .info.  Furthermore, Bruce Tonkin, the current Vice-Chairman of ICANN's Board of Directors, is Chief Strategy Officer of Melbourne, IT, which has an agreement with Afilias for .info and has an agreement for services for new gTLD applicants with Afilias.

61.     For further example, Dr. Vinton Cerf, the former Chairman of ICANN's Board of Directors, has served as vice president and chief Internet evangelist for Google since October 2005.  In this role, Dr. Cerf is responsible for advising Google on new enabling technologies and applications on the Internet and other platforms, including new gTLDs, for Google.

62.     On June 13, 2012, even though IOD's .WEB TLD Application was still pending before ICANN, ICANN did not identify IOD as an applicant to operate the .WEB TLD.

63.     Allowing other entities to file applications for a .WEB TLD, while IOD's .WEB TLD Application was still pending, is improper, unlawful and inequitable.

64.     Allowing other entities to file applications for a .WEB TLD, when IOD owns the .WEB Mark, is improper, unlawful and inequitable.

65.     ICANN recognizes that its process for new TLDs may result in trademark or service mark infringement.  ICANN's policy permits a mark holder to file an objection that its trademarks are infringed by the new TLDs.

/ / /

/ / /

/ / /

CHRISTIE, PARKER & HALE, LLP

**First Cause of Action**

**(Breach of Contract)**

66.   IOD realleges and incorporates by reference each of the allegations contained in Paragraphs 1 through 65 of this Complaint as though fully set forth.

67.   ICANN made a written offer in 2000 for entities to submit applications seeking to sponsor or operate one or more new TLDs.

68.   As part of this written offer, ICANN provided to entities a New TLD Registry Application Form, instructions for filling out the application, and a statement of criteria for ICANN's Board of Directors' eventual decision.

69.   As part of this written offer, ICANN required applicants to pay a non-refundable $50,000 to have their application reviewed by ICANN.

70.   ICANN further agreed, pursuant to its By-Laws and Agreements, that it "shall not apply its standards, policies, procedures or practices inequitably or single out any particular party for disparate treatment unless justified by substantial and reasonable cause, such as the promotion of effective competition."

71.   In 2000, when IOD submitted its application for the .WEB TLD and paid ICANN a $50,000 non-refundable fee, IOD and ICANN entered into a contract to have IOD's .WEB TLD Application reviewed, analyzed, and approved or rejected according to the criteria established by ICANN in 2000.

72.   IOD has complied with all of the requirements, has fulfilled all of its obligations, and has taken all actions required of it, pursuant to the terms of its contract with ICANN.

73.   ICANN has never rejected IOD's .WEB TLD Application.

74.   ICANN has affirmed that IOD's .WEB TLD Application is still pending.

75.   ICANN has affirmed that IOD will have the option to have ICANN consider IOD's .WEB TLD Application when additional TLD selections are made by ICANN.

-13-

76.    ICANN has affirmed that IOD's .WEB TLD Application would be considered later by ICANN.

77.    Despite these affirmations and assurances, ICANN has not yet considered, approved or rejected IOD's .WEB TLD Application.

78.    ICANN has breached the terms of its agreement with IOD by accepting applications from other entities seeking a .WEB TLD and running a .WEB registry before considering, approving or rejecting IOD's .WEB TLD Application.

79.    As a result of ICANN's breach of its agreement with IOD, IOD has been damaged because it did not submit any new application for a .WEB TLD and has been foreclosed from having its application for a .WEB TLD considered by ICANN.

80.    As a result of ICANN's breach of its agreement with IOD, and ICANN's acceptance of seven new applications for the .WEB TLD, IOD has been irreparably harmed and, if ICANN is not enjoined from considering those new applications, IOD will continue to be irreparably harmed.

81.    As a result of ICANN's breach of its agreement with IOD, and ICANN's acceptance of seven new applications for the .WEB TLD, IOD's remedy at law is not adequate to compensate it for the injuries inflicted. Accordingly, IOD is entitled to entry of injunctive relief.

<strong>Second Cause of Action</strong>

<strong>(Breach of Covenant of Good Faith and Fair Dealing)</strong>

82.    IOD realleges and incorporates by reference each of the allegations contained in Paragraphs 1 through 81 of this Complaint as though fully set forth.

83.    In 2000, when IOD submitted its application for the .WEB TLD and paid ICANN a $50,000 non-refundable fee, IOD and ICANN entered into a contract to have IOD's .WEB TLD Application reviewed, analyzed, and approved or rejected according to the criteria established by ICANN in 2000.

CHRISTIE, PARKER & HALE, LLP

84.   As a result of this contract, ICANN has a duty of good faith and fair dealing in its performance and its enforcement of its contract.   This duty is especially high since ICANN is invested with a discretionary power affecting the rights of IOD.

85.   ICANN has breached its covenant of good faith and fair dealing with IOD because ICANN has not yet considered, approved or rejected IOD's .WEB TLD Application thus frustrating IOD's rights to receive the benefits of the contract.

86.   ICANN has breached its covenant of good faith and fair dealing with IOD by accepting applications from other entities seeking a .WEB TLD and running a .WEB registry before considering, approving or rejecting IOD's .WEB TLD Application thus frustrating IOD's rights to receive the benefits of the contract.

87.   ICANN has breached its covenant of good faith and fair dealing with IOD by accepting applications for a .WEB TLD and to run a .WEB registry from other entities with conflicts of interests with, and former ties to, ICANN.

88.   As a result of ICANN's breach of its covenant of good faith and fair dealing with IOD, IOD has been damaged because it did not submit any new application for a .WEB TLD and has been foreclosed from having its application for a .WEB TLD be considered by ICANN.

89.   As a result of ICANN's breach of its covenant of good faith and fair dealing with IOD, and ICANN's acceptance of seven new applications for the .WEB TLD, IOD has been irreparably harmed and, if ICANN is not enjoined from considering those new applications, IOD will continue to be irreparably harmed.

90.   As a result of ICANN's breach of its covenant of good faith and fair dealing with IOD, and ICANN's acceptance of seven new applications for the .WEB TLD, IOD's remedy at law is not adequate to compensate it for the injuries

CHRISTIE, PARKER & HALE, LLP

1   inflicted.  Accordingly, IOD is entitled to entry of injunctive relief.

2                         **Third Cause of Action**

3   **(Trademark and Service Mark Infringement Under 15 U.S.C. § 1114(1))**

4        91.   IOD realleges and incorporates by reference each of the allegations

5   contained in Paragraphs 1 through 90 of this Complaint as though fully set forth.

6        92.   IOD has used in commerce on and in connection with its goods and

7   services the .WEB Mark.

8        93.   IOD's use of the .WEB Mark is unique and distinctive and

9   designates a single source of origin.

10       94.   IOD owns a United States trademark and service mark registration

11  for the .WEB Mark, Registration No. 3,177,334.

12       95.   Each of the seven new applicants has paid, and ICANN has

13  accepted, non-refundable deposits of $185,000 to operate the .WEB registry in

14  the Internet's primary DNS root system controlled by ICANN.

15       96.   ICANN has stated, through its guidebook, press releases regarding

16  the addition of new TLDs including the .WEB TLD, and postings on its website,

17  that it intends to permit one or more of the new applicants to operate the .WEB

18  registry in the Internet's primary DNS root system controlled by ICANN.

19       97.   ICANN's acceptance of the seven $185,000 deposits, and ICANN's

20  affirmations that it intends to permit one or more of the new applicants to operate

21  the .WEB registry in the Internet's primary DNS root system controlled by

22  ICANN, constitute a use in commerce of IOD's federally registered trademark

23  and service mark which is likely to cause confusion, mistake, or to deceive.

24       98.   The above-described acts of ICANN constitute trademark and

25  service mark infringement in violation of 15 U.S.C. § 1114(1), entitling IOD to

26  relief.

27       99.   ICANN has unfairly profited from the trademark and service mark

28  infringement alleged.

CHRISTIE, PARKER & HALE, LLP

100.   By reason of ICANN's acts of trademark and service mark infringement, IOD has suffered damage to the goodwill associated with the .WEB Mark.

101.   ICANN's acts of trademark and service mark infringement have irreparably harmed and, if not enjoined, will continue to irreparably harm IOD and its federally registered trademark and service mark.

102.   ICANN's acts of trademark and service mark infringement have irreparably harmed and, if not enjoined, will continue to irreparably harm the general public who has an interest in being free from confusion, mistake, and deception.

103.   By reason of ICANN's acts of trademark and service mark infringement, IOD's remedy at law is not adequate to compensate it for the injuries inflicted by ICANN.   Accordingly, IOD is entitled to injunctive relief pursuant to 15 U.S.C. § 1116.

104.   By reason of ICANN's willful acts of trademark and service mark infringement, IOD is entitled to damages, and that those damages be trebled under 15 U.S.C. § 1117.

105.   This is an exceptional case making IOD eligible for an award of attorneys' fees under 15 U.S.C. § 1117.

**Fourth Cause of Action**

**(Trademark and Service Mark Infringement and False Designation of Origin Under 15 U.S.C. § 1125(a))**

106.   IOD realleges and incorporates by reference each of the allegations contained in Paragraphs 1 through 105 of this Complaint as though fully set forth.

107.   IOD has used in commerce on and in connection with its goods and services the .WEB Mark.

108.   IOD's use of the .WEB Mark is unique and distinctive and designates a single source of origin.

-17-

109.   Each of the seven new applicants has paid, and ICANN has accepted, non-refundable deposits of $185,000 to operate the .WEB registry in the Internet's primary DNS root system controlled by ICANN.

110.   ICANN has stated, through its guidebook, press releases regarding the addition of new TLDs including the .WEB TLD, and postings on its website, that it intends to permit one or more of the new applicants to operate the .WEB registry in the Internet's primary DNS root system controlled by ICANN.

111.   ICANN's acceptance of the seven $185,000 deposits, and ICANN's affirmations that it intends to permit one or more of the new applicants to operate the .WEB registry in the Internet's primary DNS root system controlled by ICANN, constitute a use in commerce of IOD's and is likely to cause confusion, or to cause mistake, or to deceive the relevant public that services authorized by a .WEB registry are authorized, sponsored or approved by or are affiliated with IOD.

112.   The above-described acts of ICANN constitute trademark and service mark infringement and false designation of origin in violation of 15 U.S.C. § 1125(a), entitling IOD to relief.

113.   IOD is being damaged and is likely to be damaged in the future by ICANN's infringement by reason of the likelihood that users of a .WEB registry will be confused or mistaken as to source, sponsorship or affiliation.

114.   ICANN has unfairly profited from the actions alleged herein and will continue to unfairly profit and become unjustly enriched unless and until such conduct is enjoined.

115.   By reason of the above-described acts of ICANN, IOD has suffered and will continue to suffer damage to the goodwill associated with the .WEB Mark.

116.   The above-described acts of ICANN have irreparably harmed and, if not enjoined, will continue to irreparably harm IOD and the .WEB Mark.

CHRISTIE, PARKER & HALE, LLP

117.   The above-described acts of ICANN have irreparable harmed and, if not enjoined, will continue to irreparably harm the general public which has an interest in being free from confusion, mistake, and deception.

118.   By reason of the above-described acts of ICANN, IOD's remedy at law is not adequate to compensate it for the injuries inflicted.  Accordingly, IOD is entitled to entry of injunctive relief pursuant to 15 U.S.C. § 1116.

119.   Because the above-described acts of ICANN were willful, IOD is entitled to damages, and that those damages be trebled, under 15 U.S.C. § 1117.

120.   This is an exceptional case making IOD eligible for an award of attorneys' fees under 15 U.S.C. § 1117.

### Fifth Cause of Action

### (Contributory Trademark and Service Mark Infringement
### Under 15 U.S.C. §§ 1114(1) and 1125(a))

121.   IOD realleges and incorporates by reference each of the allegations contained in Paragraphs 1 through 120 of this Complaint as though fully set forth.

122.   ICANN contributed to the application and use of the .WEB TLD by others.

123.   ICANN provided the forum by which other entities have applied to operate the .WEB registry in the Internet's primary DNS root system controlled by ICANN, and ICANN has profited from the applications.

124.   ICANN is able to monitor and control the applications to operate the .WEB registry in the Internet's primary DNS root system controlled by ICANN.

125.   ICANN is able to monitor and control the operation of the .WEB registry in the Internet's primary DNS root system controlled by ICANN.

126.   ICANN is aware that IOD owns the .WEB Mark and that selecting an applicant other than IOD to run the .WEB registry in the Internet's primary DNS root system controlled by ICANN would infringe the trademark and service mark rights of IOD.

CHRISTIE, PARKER & HALE, LLP

127.   Despite this knowledge, ICANN continues to allow companies other than IOD to apply to run the .WEB registry in the Internet's primary DNS root system controlled by ICANN.

128.   Despite this knowledge, ICANN has intentionally induced, and continues to intentionally induce companies other than IOD to apply to run the .WEB registry in the Internet's primary DNS root system controlled by ICANN.

129.   IOD's .WEB Mark is distinctive and federally registered at the USPTO at the time that ICANN permitted applications for a .WEB TLD.

130.   Permitting other entities to own a .WEB TLD and run a .WEB registry would be confusingly similar to IOD's .WEB Mark.

131.   The use by others of a .WEB TLD, or running a .WEB registry, constitutes trademark and service mark infringement in violation of 15 U.S.C. § 1114(1) and 15 U.S.C. § 1125(a), entitling IOD to relief.

132.   By reason of ICANN's acts alleged herein, IOD's remedy at law is not adequate to compensate them for the injuries inflicted by ICANN. Accordingly, IOD is entitled to preliminary and permanent injunctive relief pursuant to 15 U.S.C. § 1116.

133.   By reason of ICANN's acts alleged herein, IOD is entitled to recover ICANN's profits, actual damages and the costs of the action.

134.   This is an exceptional case making IOD eligible for an award of attorneys' fees under 15 U.S.C. § 1117.

## Sixth Cause of Action

### (Intentional Interference With Contractual Relations)

135.   IOD realleges and incorporates by reference each of the allegations contained in Paragraphs 1 through 134 of this Complaint as though fully set forth.

136.   IOD maintains contractual relationships with its customers, who purchase IOD's .WEB services, including the ability to register a domain name in IOD's .WEB registry.

-20-

CHRISTIE, PARKER & HALE, LLP

137.   ICANN knows that IOD has contracts with its customers to provide and manage domain names that resolve in IOD's .WEB registry.

138.   ICANN has intentionally and knowingly interfered with IOD's existing customer contracts by permitting other entities to apply for and operate a .WEB registry in the Internet's primary DNS root system controlled by ICANN. Because IOD has made its .WEB registry services available via alternate DNS root systems, and to consumers who chose to modify their web browsers to resolve domain names ending in .WEB, the inclusion of .WEB in the Internet's primary DNS root system by ICANN will cause computer users searching for IOD's customers' computers, to reach other computers instead.

139.   ICANN's acceptance of the seven $185,000 deposits, and ICANN's affirmations that it intends to permit one or more of the new applicants to operate the .WEB registry in the Internet's primary DNS root system controlled by ICANN, has disrupted and interfered with, and will continue to disrupt and interfere with, IOD's ability to fulfill its contractual obligations to provide .WEB registry services to its customers.

140.   As a result of ICANN's intentional interference with IOD's contractual relations, IOD has been damaged in an amount to be determined at trial.

141.   As a result of ICANN's intentional interference with IOD's contractual relations, IOD has been irreparably harmed and, if ICANN is not enjoined from considering those new applications, IOD will continue to be irreparably harmed.

142.   As a result of ICANN's intentional interference with IOD's contractual relations, IOD's remedy at law is not adequate to compensate it for the injuries inflicted.  Accordingly, IOD is entitled to entry of injunctive relief.

143.   ICANN's intentional interference with IOD's contractual relations was done with oppression, malice a nd fraud, an d undertaken with conscious

CHRISTIE, PARKER & HALE, LLP

1   disregard for the rights of others, including IOD.  Therefore, IOD is entitled to an

2   award of punitive and exemplary damages against ICANN.

3                            **Seventh Cause of Action**

4   **(Intentional Interference With Prospective Economic Advantage)**

5           144.   IOD realleges and incorporates by reference each of the allegations

6   contained in Paragraphs 1 through 143 of this Complaint as though fully set forth.

7           145.   IOD maintains relationships with prospective customers, who in the

8   future may purchase IOD's .WEB services, including the ability to register a

9   domain name in IOD's .WEB registry.  These relationships are likely to provide

10  future economic benefit to IOD.

11          146.   ICANN knows of IOD's potential relationships with prospective

12  customers.

13          147.   ICANN has intentionally and knowingly interfered with IOD's

14  prospective customers by permitting other entities to apply for and operate a

15  .WEB registry in the Internet's primary DNS root system controlled by ICANN.

16  Because IOD has made its .WEB registry services available via alternate DNS

17  root systems, and to consumers who chose to modify their web browsers to

18  resolve domain names ending in .WEB, the inclusion of .WEB in the Internet's

19  primary DNS root system by ICANN will cause computer users searching for

20  IOD's customers' and potential customers' computers, to reach other computers

21  instead.

22          148.   ICANN's acceptance of the seven $185,000 deposits, and ICANN's

23  affirmations that it intends to permit one or more of the new applicants to operate

24  the .WEB registry in the Internet's primary DNS root system controlled by

25  ICANN, has disrupted and interfered with, and will continue to disrupt and

26  interfere with, IOD's ability to obtain new contractual obligations to provide its

27  .WEB services including it .WEB registry services.

28

CHRISTIE, PARKER & HALE, LLP

149.   As a result of ICANN's intentional interference with IOD's prospective economic advantage, IOD has been damaged in an amount to be determined at trial.

150.   As a result of ICANN's intentional interference with IOD's prospective economic advantage, IOD has been irreparably harmed and, if ICANN is not enjoined from considering those new applications, IOD will continue to be irreparably harmed.

151.   As a result of ICANN's intentional interference with IOD's prospective economic advantage, IOD's remedy at law is not adequate to compensate it for the injuries inflicted.  Accordingly, IOD is entitled to entry of injunctive relief.

152.   ICANN's intentional interference with IOD's prospective economic advantage was done with oppression, malice and fraud, and undertaken with conscious disregard for the rights of others, including IOD.  Therefore, IOD is entitled to an award of punitive and exemplary damages against ICANN

### Request for Relief

**Therefore**, IOD respectfully requests judgment as follows:

1.      That the Court enter a judgment against ICANN that ICANN has:

   a.      infringed the rights of IOD in its federally registered .WEB Mark in violation of 15 U.S.C. § 1114;

   b.      infringed the rights of IOD in its .WEB Mark in violation of 15 U.S.C. § 1125;

   c.      contributed to the infringement of the rights of IOD in its .WEB Mark;

   d.      breached its contract with IOD;

   e.      breached its covenant of good faith and fair dealing with IOD;

   f.      intentionally interfered with IOD's contractual relations; and

-23-

      g.    intentionally interfered with IOD's prospective economic advantage.

2.    That each of the above acts was willful.

3.    That the Court issue a Temporary Restraining Order and Preliminary Injunction enjoining and restraining ICANN and its respective agents, servants, employees, successors and assigns, and all other persons acting in concert with or in conspiracy with or affiliated with ICANN, from using the .WEB TLD in a manner that is likely to cause confusion regarding whether ICANN or any of the seven entities applying for the .WEB TLD are affiliated or associated with or sponsored by IOD.

4.    That IOD be awarded damages for ICANN's trademark and service mark infringement, contributory trademark and service mark infringement, breach of contract, breach of the covenant of good faith and fair dealing, intentional interference with contractual relations and intentional interference with prospective economic advantage.

5.    That IOD be awarded ICANN's profits resulting from its infringement of IOD's .WEB Mark.

6.    That ICANN be ordered to account for and disgorge to IOD all amounts by which ICANN has been unjustly enriched by reason of the unlawful acts complained of.

7.    That damages resulting from ICANN's willful infringement be trebled in accordance with the provisions of 15 U.S.C. § 1117.

8.    That IOD be awarded punitive and exemplary damages against ICANN in an amount according to proof.

9.    That the Court issue a Permanent Injunction enjoining and restraining ICANN and its respective agents, servants, employees, successors and assigns, and all other persons acting in concert with or in conspiracy with or affiliated with ICANN, from using the .WEB TLD in a manner that is likely to

CHRISTIE, PARKER & HALE, LLP

1    cause confusion regarding whether ICANN or any of the seven entities applying

2    for the .WEB TLD are affiliated or associated with or sponsored by IOD.

3           10.    That the Court award IOD its reasonable attorneys' fees pursuant to

4    15 U.S.C. § 1117, and any other applicable provision of law.

5           11.    That the Court award IOD its costs of suit incurred herein.

6           12.    That IOD be awarded such other relief as may be appropriate.

7

8    DATED:  October 17, 2012            Respectfully submitted,

9                                        CHRISTIE, PARKER & HALE, LLP

10

11                                  By   _Howard A. Kroll_____

12                                        David J. Steele
                                          Howard A. Kroll

13                                        Attorneys for Plaintiff
                                          IMAGE ONLINE DESIGN, INC.

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## DEMAND FOR TRIAL BY JURY

Plaintiff Image Online Design, Inc. her eby demands a trial by jury to decide all issues so triable in this case.


DATED:  October 17, 2012

Respectfully submitted,

CHRISTIE, PARKER & HALE, LLP


By _____

David J. Steele
Howard A. Kroll

Attorneys for Plaintiff
IMAGE ONLINE DESIGN, INC.

SCL PAS1185767.5-*-10/17/12 1:31 PM

CHRISTIE, PARKER & HALE, LLP

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge Dean D. Pregerson and the assigned discovery Magistrate Judge is Jacqueline Chooljian.

The case number on all documents filed with the Court should read as follows:

## CV12- 8968 DDP  (JCx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

=================================================

#### NOTICE TO COUNSEL

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| ☑ **Western Division** | ☐ **Southern Division** | ☐ **Eastern Division** |
|---|---|---|
| 312 N. Spring St., Rm. G-8 | 411 West Fourth St., Rm. 1-053 | 3470 Twelfth St., Rm. 134 |
| Los Angeles, CA 90012 | Santa Ana, CA 92701-4516 | Riverside, CA 92501 |

Failure to file at the proper location will result in your documents being returned to you.

CV-18 (03/06)        NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

Name & Address:
David J. Steele, CA Bar No. 209797
Howard A. Kroll, CA Bar No. 100981
CHRISTIE, PARKER & HALE, LLP
655 N. Central Avenue, Suite 2300
Glendale, CA 91203-1445          (626) 795-9900
Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| IMAGE ONLINE DESIGN, INC., | CASE NUMBER |
| PLAINTIFF(S) | CV12-08968 DDP (JCx) |
| v. | |
| INTERNET CORPORATION FOR ASSIGNED NAMES AND NUMBERS, | **SUMMONS** |
| DEFENDANT(S). | |

TO:    DEFENDANT(S):

A lawsuit has been filed against you.

Within ___21___ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure.   The answer or motion must be served on the plaintiff's attorney, ___Howard A. Kroll_____, whose address is Christie, Parker & Hale,LLP, 655 N. Central Ave., Suite 2300, Glendale, CA 91203-1145. If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint.   You also must file your answer or motion with the court.

Clerk, U.S. District Court

Dated: OCT 17 2012 _____

By: _____

Deputy Clerk

*(Seal of the Court)*

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States.  Allowed 60 days by Rule 12(a)(3)].*

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
CIVIL COVER SHEET

| I (a) PLAINTIFFS (Check box if you are representing yourself ☐) | DEFENDANTS |
|---|---|
| IMAGE ONLINE DESIGN, INC. | INTERNET CORPORATION FOR ASSIGNED NAMES AND NUMBERS |

| (b) Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.) | Attorneys (If Known) |
|---|---|
| David J. Steele; Howard A. Kroll     Tel.: (626) 795-9900<br>CHRISTIE, PARKER & HALE, LLP<br>655 N. Central Avenue, Suite 2300, Glendale, CA 91203-1445 | |

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff     ☒ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant     ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☒ 1 Original Proceeding     ☐ 2 Removed from State Court     ☐ 3 Remanded from Appellate Court     ☐ 4 Reinstated or Reopened     ☐ 5 Transferred from another district (specify):     ☐ 6 Multi-District Litigation     ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT:    JURY DEMAND:** ☒ Yes   ☐ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☐ Yes ☒ No          ☒ **MONEY DEMANDED IN COMPLAINT: $** __ To be determined at trial

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
15 U.S.C.§1141(1)-Trademark Infringement/Contributory Trademark Infringement; 15 U.S.C.§1125(a)-Trademark Infringement/Contributory Trademark Infringement & False Designation of Origin; related State causes of action

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 530 General | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 535 Death Penalty | ☐ 740 Railway Labor Act |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | **BANKRUPTCY** | ☐ 540 Mandamus/ Other | ☐ 790 Other Labor Litigation |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | ☐ 151 Medicare Act | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | ☐ 550 Civil Rights | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 555 Prison Condition | **PROPERTY RIGHTS** |
| ☐ 490 Cable/Sat TV | | ☐ 355 Motor Vehicle Product Liability | **CIVIL RIGHTS** | **FORFEITURE / PENALTY** | ☐ 820 Copyrights |
| ☐ 810 Selective Service | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 610 Agriculture | ☐ 830 Patent |
| ☐ 850 Securities/Commodities/ Exchange | ☐ 160 Stockholders' Suits | ☐ 362 Personal Injury- Med Malpractice | ☐ 442 Employment | ☐ 620 Other Food & Drug | ☒ 840 Trademark |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 190 Other Contract | ☐ 365 Personal Injury- Product Liability | ☐ 443 Housing/Acco- mmodations | ☐ 625 Drug Related Seizure of Property 21 USC 881 | **SOCIAL SECURITY** |
| ☐ 890 Other Statutory Actions | ☐ 195 Contract Product Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | | ☐ 861 HIA (1395ff) |
| ☐ 891 Agricultural Act | ☐ 196 Franchise | | ☐ 445 American with Disabilities - Employment | ☐ 630 Liquor Laws | ☐ 862 Black Lung (923) |
| ☐ 892 Economic Stabilization Act | **REAL PROPERTY** | **IMMIGRATION** | | ☐ 640 R.R. & Truck | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 893 Environmental Matters | ☐ 210 Land Condemnation | ☐ 462 Naturalization Application | ☐ 446 American with Disabilities - Other | ☐ 650 Airline Regs | ☐ 864 SSID Title XVI |
| ☐ 894 Energy Allocation Act | ☐ 220 Foreclosure | ☐ 463 Habeas Corpus- Alien Detainee | ☐ 440 Other Civil Rights | ☐ 660 Occupational Safety /Health | ☐ 865 RSI (405(g)) |
| ☐ 895 Freedom of Info. Act | ☐ 230 Rent Lease & Ejectment | ☐ 465 Other Immigration Actions | | ☐ 690 Other | **FEDERAL TAX SUITS** |
| ☐ 900 Appeal of Fee Determi- nation Under Equal Access to Justice | ☐ 240 Torts to Land | | | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 950 Constitutionality of State Statutes | ☐ 245 Tort Product Liability | | | | ☐ 871 IRS-Third Party 26 USC 7609 |
| | ☐ 290 All Other Real Property | | | | |

**VIII. OFFICE USE ONLY:    Case Number:** _____ CV12-08968

AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
CIVIL COVER SHEET

II(a). **IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed? ☑ No ☐ Yes
yes, list case number(s): _____

II(b). **RELATED CASES:** Have any cases been previously filed in this court that are related to the present case? ☑ No ☐ Yes
yes, list case number(s): _____

vil cases are deemed related if a previously filed case and the present case:

heck all boxes that apply) ☐ A. Arise from the same or closely related transactions, happenings, or events; or
☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or
☐ C. For other reasons would entail substantial duplication of labor if heard by different judges; or
☐ D. Involve the same patent, trademark or copyright, and one of the factors identified above in a, b or c also is present.

. **VENUE:** (When completing the following information, use an additional sheet if necessary.)

List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named plaintiff resides.
Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| ounty in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| n Luis Obispo | |

List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named defendant resides.
Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| ounty in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| os Angeles | |

List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH claim arose.
**Note: In land condemnation cases, use the location of the tract of land involved.**

| ounty in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| n Luis Obispo | |
| s Angeles | |

os Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties
e: In land condemnation cases, use the location of the tract of land involved

SIGNATURE OF ATTORNEY (OR PRO PER): *Howard A. Kroll* Date October 17, 2012

**Notice to Counsel/Parties:** The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings
or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed
but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |