O

JS - 6

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

IMAGE ONLINE DESIGN, INC.,      )   Case No. CV 12-08968 DDP (JCx)
                                )
                Plaintiff,      )   **ORDER GRANTING MOTION TO DISMISS**
                                )
        v.                      )   [Dkt. No. 13]
                                )
INTERNET CORPORATION FOR        )
ASSIGNED NAMES AND NUMBERS,     )
                                )
                Defendant.      )
_____ )

Presently before the court is Defendant Internet Corporation for Assigned Names and Numbers (ICANN)'s Motion to Dismiss Complaint.  Having considered the parties' submissions and heard oral argument, the court adopts the following order.

**I. BACKGROUND**

Defendant ICANN is a California public benefit corporation that has been authorized by the United States government to administer the Internet's primary domain name system ("DNS"). (Compl. ¶ 23.)  Each computer connected to the Internet has a unique identity established by its Internet Protocol address ("IP address").  (Id. ¶ 9.)  The DNS converts numeric IP addresses, which are difficult to remember, into an alphanumeric hostname that

1  is easier to remember, such as myhost.cnn.com.  (Id. ¶¶ 10-11.)
2  The field to the right of the last period, the ".com" in the
3  example above, is known as a top level domain ("TLD"), and the
4  field to the left of the TLD, "cnn" in the example, is the second
5  level domain ("SLD").  (Id. ¶ 17.)  The field to the left of the
6  SLD, if any, is called a third level domain.  (Id. ¶ 18.)

7      In the early years of the Internet, the United States
8  government operated the DNS through contractual arrangements with
9  third parties.  (Id. ¶ 24.)  ICANN was created in 1998 by the
10  United States Department of Commerce to administer the DNS, as part
11  of an initiative to privatize management of the DNS.  (Id. ¶¶ 23,
12  25.)  ICANN has overall authority to manage the DNS and the
13  Department of Commerce retains no regulatory oversight or statutory
14  authority.  (Id. ¶¶ 26-27.)  ICANN determines what new TLDs to
15  approve and selects and contracts with registries to operate the
16  TLDs.  (Id. ¶ 26.)

17      Plaintiff Image Online Design ("IOD") is a California
18  Corporation with its principal place of business in San Luis
19  Obispo, California.  (Id. ¶ 4.)  Since 1996, IOD has been and
20  currently is engaged in providing telecommunications services,
21  namely, Internet registry services using the service mark .WEB.
22  (Id. ¶ 29.)  IOD has made its .WEB registry services available
23  through an alternate DNS root system to consumers who choose to
24  modify their web browsers to resolve domain names ending in .WEB.
25  (Id. ¶ 30.)  IOD has registered over 20,000 .WEB domain names.
26  (Id.)

27      In 2000, ICANN issued a call for proposals by those seeking to
28  sponsor or operate one or more new TLDs, and issued a New TLD

1  Registry Application Form, instructions for filling out the

2  application, and a statement of criteria for the eventual decision.

3  (Id. ¶¶ 42, 68.) On October 1, 2000, IOD submitted an application

4  for the TLD .WEB, for which IOD was to act as the registry

5  operator, and paid the application fee of $50,000.  (Id. ¶ 45.)  On

6  November 16, 2000, ICANN's Board of Directors issued its decision

7  on new TLDs, identifying seven selected for the "proof of concept

8  phase."  (Id. ¶ 46.)  The TLD .WEB was not selected.  (Id.)  At

9  some time during the deliberations in 2000, the then Chairman of

10 the Board of Directors Dr. Vincent Cerf stated, "I'm still

11 interested in IOD.  They've worked with .WEB for some time.  To

12 assign that to someone else given that they're actually functioning

13 makes me uneasy."  (Id. ¶ 47.)

14     On December 15, 2000, IOD filed with ICANN a request for

15 reconsideration of IOD's .WEB TLD application.  (Id. ¶ 48.) ICANN's

16 Reconsideration Committee responded on March 16, 2001, stating, "it

17 should be clear that **no applications were rejected**; the object was

18 not to pick winners and losers, but to select a limited number of

19 appropriate proposals for a proof of concept.  **All of the proposals**

20 **not selected remain pending, and those submitting them will**

21 **certainly have the option to have them considered if and when**

22 **additional TLD selections are made**."  (Id. ¶ 49, emphasis in

23 Complaint.)  ICANN's Board adopted this recommendation and its

24 reasoning on May 7, 2001.  (Id. at ¶ 50.)

25     ICANN issued a guidebook for applications for new TLDs in June

26 2011 (revised in June 2012), and the application window was opened

27 on January 12, 2012, and closed on May 30, 2012.  (Id. ¶¶ 54-55.)

28 The guidebook stated that IOD could have received an $86,000 credit

1  toward the $185,000 new application fee on the condition that it

2  would agree that it "has no legal claims arising from the 2000

3  proof-of-concept process." (<u>Id.</u> ¶ 57.)  IOD did not submit a new

4  application because, the Complaint alleges, IOD's .WEB TLD

5  application was still pending before ICANN. (<u>Id.</u> ¶ 56.)  Seven

6  applications to operate a .WEB TLD were submitted. (<u>Id.</u> ¶ 58.)

7  ICANN did not identify IOD as an applicant to operate the .WEB TLD.

8  (<u>Id.</u> ¶ 62.)  ICANN has stated in its guidebook, press releases, and

9  website postings that it intends to permit one or more applicants

10 to operate the .WEB registry in the DNS root system controlled by

11 ICANN.  (<u>Id.</u> ¶ 96.)

12      IOD asserts contract, trademark, and tortious interference

13 claims against ICANN. ICANN moves to dismiss on the grounds that

14 (1) IOD executed a release of ICANN in its 2000 Application,

15 forever discharging ICANN from "any and all" claims relating to

16 ICANN's "action or inaction" in connection with IOD's application,

17 (2) IOD has not alleged facts plausibly suggesting that ICANN

18 breached any terms of the 2000 Application, (3) IOD has not alleged

19 facts plausibly suggesting that ICANN has engaged in trademark

20 infringement, and (4) IOD has not alleged facts plausibly

21 suggesting that ICANN intentionally interfered with IOD's business

22 interests.

23 **II. LEGAL STANDARD**

24      Under Federal Rule of Civil Procedure 12(b)(6), a complaint is

25 subject to dismissal when the plaintiff's allegations fail to state

26 a claim upon which relief can be granted.  "When determining

27 whether a complaint states a claim, a court must accept as true all

28 allegations of material fact and must construe those facts in the

light most favorable to the plaintiff."  Resnick v. Hayes, 213 F.3d
443, 447 (9th Cir. 2000).

In Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009), the Supreme
Court explained that a court considering a 12(b)(6) motion should
first "identify[] pleadings that, because they are no more than
conclusions, are not entitled to the assumption of truth."  Id.
Next, the court should identify the complaint's "well-pleaded
factual allegations, . . . assume their veracity and then determine
whether they plausibly give rise to an entitlement to relief."
Id.; see also Moss v. U.S. Secret Serv., 572 F.3d 962, 969 (9th
Cir. 2009) ("In sum, for a complaint to survive a motion to
dismiss, the non-conclusory factual content, and reasonable
inferences from that content, must be plausibly suggestive of a
claim entitling the plaintiff to relief.") (internal quotation
marks omitted).

**III. DISCUSSION**

**A. Contract Claims**

**1. Breach of Contract**

IOD alleges that ICANN breached its contract by "accepting
applications from other entities seeking a .WEB TLD and running a
.WEB registry before considering, approving or rejecting IOD's .WEB
TLD application."  (Compl. ¶ 78.)  ICANN disputes that this is a
breach of contract and argues that IOD has not identified a
specific contract provision that ICANN has allegedly breached.

IOD cites a number of statements by ICANN in support of its
breach of contract claim. It points, first, to Reconsideration
Request 00-13, Recommendation of the Committee, March 16, 2001
("Reconsideration Recommendation").  The Reconsideration

1    Recommendation was a response to IOD's request for reconsideration

2    of ICANN's decision not to select .WEB as a new TLD.  (Compl. ¶¶

3    46-48.)  It provided specific responses to IOD's reasons why their

4    request should be reconsidered, and also made general comments on

5    the selection and reconsideration process.  It stated, "All of the

6    proposals not selected remain pending, and those submitting them

7    will certainly have the option to have them considered if any when

8    additional TLD selections are made."  (Compl. ¶ 49; RJN Exh. H,

9    emphasis omitted.)

10       IOD also alleges that during ICANN's deliberations, the

11   Chairman of ICANN's Board of Directors stated: "I'm still

12   interested in IOD.  They've worked with .WEB for some time.  To

13   assign that to someone else given that they're actually functioning

14   makes me uneasy."  (Compl. ¶ 47.)  Finally, IOD alleges that the

15   Chairman testified before Congress and stated that "one of the

16   things that allowed [ICANN] to I think achieve consensus [on the

17   seven TLDs selected on November 16, 2000] was the belief that any

18   of the qualifying TLD applications would, in fact, be considered

19   later."  (Id. ¶ 51.)

20       When reviewing breach of contract claims, courts "must

21   determine whether the alleged agreement is 'reasonably susceptible'

22   to the meaning ascribed to it in the complaint."  Klein v. Chevron

23   U.S.A., Inc., 202 Cal. App. 4th 1342, 1384 (2012).  "A secondary

24   document becomes part of a contract as though recited verbatim when

25   it is incorporated into the contract by reference provided that the

26   terms of the incorporated document are readily available to the

27   other party."  Republic Bank v. Marine Nat. Bank, 45 Cal.App.4th

28   919, 923 (1996)(internal citations and quotation marks omitted).

1    Here, the contract appears to consist of the Unsponsored TLD

2    Application Transmittal Form (the "Application"), signed by John S.

3    Frangie, Chief Executive Officer, Image Online Design, Inc.[1]   (RJN

4    Exh. C.)   The Application specifically incorporates a number of

5    other documents.   In it, Mr. Frangie certified that "all documents

6    linked directly or indirectly from 'TLD Application Process:

7    Information for Applicants' . . . have been thoroughly reviewed on

8    behalf of applicant.   In particular, the following documents have

9    been reviewed: B3.1. New TLD Application Process Overview . . .

10   B3.2 New TLD Application Instructions . . . B3.3 Criteria for

11   Assessing TLD Proposals . . . ."   (Id.)

12        IOD does not specifically claim that the statements in the

13   Reconsideration Recommendation or made by the Chairman, discussed

14   above, were part of the Agreement.   Indeed, the Agreement would not

15   be "reasonably susceptible" to such an interpretation. IOD provides

16   no reason why statements beyond the Agreement, made after the

17   contract was entered into, should be considered to be part of the

18   contract.

19        Moreover, the explicit terms of the Agreement contradict the

20   notion that ICANN had an obligation to do anything beyond

21   considering IOD's application.   The Agreement includes the

22   following language:

23

24

25        [1]"[A] district court ruling on a motion to dismiss may
26   consider a document the authenticity of which is not contested, and
     upon which the plaintiff's complaint necessarily relies." Parrino
27   v. FHP, Inc., 146 F.3d 699, 706 (9th Cir. 1998), superceded by
     statute on other grounds.   IOD's Complaint necessarily relies on
28   the Application insofar as both of its causes of action allege
     breach of the terms of the Application.

B6.  The applicant understands and agrees that this $50,000 is only an application fee to obtain consideration of this application; that the fee will not be refunded or returned in any circumstances . . . that there is no understanding, assurance, or agreement that this application will be selected for negotiations toward entry of an agreement with a registry operator; or that, if this application is selected, the negotiations will lead to entry of such an agreement or establishment of a TLD as sought in this application.

. . . .

B12.  The applicant hereby agrees, acknowledges, and represents that it has no legally enforceable right <u>to</u> <u>acceptance or any other treatment of this application</u> or to the delegation in any particular manner of any top-level domain that may be established in the authoritative DNS root. It further agrees, acknowledges, and represents that it has no legally enforceable rights in, to, or in connection with any top-level domain by virtue of its preparation or submission of this application or by virtue of ICANN's receipt of this application, ICANN's acceptance of the application fee, ICANN's consideration or other handling of this application, or statements made in connection with this or other applications ICANN receives."

. . . .

B14.2.  [T]he applicant hereby releases and forever discharges ICANN and each of its officers, directors, employees, consultants, attorneys, and agents from any and all claims and liabilities relating in any way to (a) any action

1    or inaction by or on behalf of ICANN in connection with this

2    application or (b) the establishment or failure to establish a

3    new TLD."

4    (RJN Exh. C.)  These provisions give ICANN no responsibilities with

5    respect to IOD's Application beyond its initial consideration of

6    the Application.  Since IOD has pointed to no contract terms that

7    ICANN has breached, the court finds that IOD has failed to state a

8    claim for breach of contract.[2]

9        The court finds that IOD has not stated a claim for breach of

10   contract.

11            **2. Release of Liability**

12

13

14
_____

15        [2]ICANN points to more specific language demonstrating its lack
16   of breach in the FAQ for the 2000 Application.
         FAQ #54: If our TLD application is not accepted, what becomes
17       of our application?  I understand that the $50,000 is non-
         refundable, but does the application remain active for the
18       second round of TLD applications?
             As stated in FAQ #28, plans for any subsequent rounds of
19       TLD introduction will not be made until evaluation of the
         present proof of concept round.  It is likely that, if there
20       are subsequent rounds, there will be revisions in the program
         based on experience in the first round.  This will likely
21       require submission of new application materials.  As to the
         non-refundable application fee, please note that it "is only
22       an application fee to obtain consideration of <u>this</u>
         application."
23   (RJN, Exh. G.)  The court is not convinced that this should be
     considered to be part of the contract.  The Application includes an
24   acknowledgment on the part of IOD that "[a]ll documents linked
     directly or indirectly from 'TLD Application Process: Information
25   for Applicants," which includes the FAQ page.  However, the FAQ
     page appears not to have been a stable document, as it contains a
26   statement at the top saying, "We add/revise material on this page
     frequently.  If you have visited here before, please reload/refresh
27   this page."  (RJN Exh. G.)  Because this document is only generally
     referenced, and because it is difficult to know its content at any
28   given time, the court declines to consider it a part of the
     contract.

1    Because the court finds no claim stated for breach of

2    contract, it need not consider whether the release of liability is

3    valid.

4        **B. Trademark Claims**

5            **1. Ripeness of Trademark Infringement**

6        "To prevail on its Lanham Act trademark claim, a plaintiff

7    must prove: (1) that it has a protectible ownership interest in the

8    mark; and (2) that the defendant's use of the mark is likely to

9    cause consumer confusion." <u>Rearden LLC v. Rearden Commerce, Inc.</u>,

10   683 F.3d 1190, 1202-03 (9th Cir. 2012)(internal citations and

11   quotation marks omitted).  ICANN argues that Plaintiff's trademark

12   claims are not ripe for adjudication because, assuming that

13   Plaintiff's claim to the mark is valid with respect to TLDs,

14   Plaintiff has not alleged that ICANN has used the mark.

15       The Complaint alleges that "ICANN has stated, through its

16   guidebook, press releases regarding the addition of new TLDs

17   including the .WEB TLD, and postings on its website, that it

18   intends to permit one or more of the new applicants to operate the

19   .WEB registry in the Internet's primary DNS root system controlled

20   by ICANN." (Compl. ¶ 96.)  It alleges that ICANN has accepted seven

21   non-refundable deposits of $185,000 to operate the .WEB registry.

22   (<u>Id.</u> ¶ 95.)  Plaintiff contends in the Complaint that the

23   acceptance of the deposits combined with its affirmations of intent

24   to operate the .WEB registry together "constitute a use in commerce

25   of IOD's federally registered trademark and service mark which is

26   likely to cause confusion, mistake, or to deceive."  (<u>Id.</u> ¶ 97.)

27       ICANN argues that these facts do not amount to an infringing

28   use.  Under the Lanham Act, "a mark shall be deemed to be in use in

10

1  commerce . . . when it is used or displayed in the sale or

2  advertising of services and the services are rendered in commerce."

3  15 U.S.C. § 1127.  Here, argues ICANN, since the TLD has not been

4  approved and no registry applicant has been selected, the mark is

5  not being used by ICANN or any TLD registry service.

6      IOD contends that even if there has been no use, threats of

7  infringement are actionable before trademark infringement has in

8  fact occurred, citing a case in which the court enjoined the sale

9  of wine bearing a label that featured Marilyn Monroe's likeness

10 although the product had not yet been sold.  Nova Wines, Inc. v.

11 Adler Fels Winery LLC, 467 F.Supp.2d 965 (C.D. Cal. 2006).  That

12 case is consistent with the Ninth Circuit's holding that "specific

13 acts of alleged infringement or an immediate capability and intent

14 to produce an allegedly infringing item" constitute infringement.

15 Sweedlow, Inc. v. Rohm & Haas Co., 455 F.2d 884, 886 (9th Cir.

16 2009).  Here, IOD alleges that ICANN is in possession of a number

17 of applications to use the .WEB TLD and has stated that it intends

18 to use it.  IOD asserts that "[s]ince ICANN has the power to

19 approve new TLDs and to choose registries to operate those new

20 TLDs, and ICANN has exercised that power in the past, and ICANN has

21 publicly stated its intent to permit one of the new applicants to

22 operate the .WEB registry, it is 'plausible' that ICANN's intent

23 will be realized."  (Opp. at 13.)

24     The court finds that IOD has not alleged use of the trademark

25 or "immediate capability and intent" to infringe, and therefore the

26 trademark infringement claim is not ripe for adjudication.

27 Infringement is, at this stage, merely speculative.  Without

28 knowing, for instance, which party might be chosen to operate a

1  potential .WEB TRD, IOD cannot know whether that party itself has a

2  plausible claim to trademark in .WEB, whether ICANN will change its

3  mind about using .WEB as a TLD, or whether there is confusion

4  between IOD's registered mark and ICANN's use of .WEB.  Prior to

5  ICANN selecting an applicant, if any, to operate the TRD, the

6  parties will not be able to build a factual record that will allow

7  the court to answer any of these questions.  No one has used the

8  mark or has the immediate capability and intent to use the mark.[3]

9  Therefore the issue is not ripe.

10           **2. Trademark Claim under 15 U.S.C. § 1114(1)**

11      To state a claim for trademark infringement, a plaintiff must

12  show that defendant is "using a mark confusingly similar to a

13  valid, protectable trademark" of plaintiff's.  <u>Brookfield</u>

14  <u>Communications, Inc. v. West Coast Entertainment Corp.</u>, 174 F.3d

15  1036, 1046 (9th Cir. 1999).[4]

16      IOD has a valid trademark registration for the mark .WEB for

17  "computer accessories, namely, mouse pads, cd holders, . . . fanny

18  packs and backpacks, . . . thermal insulator containers for food or

19  beverages; cups; mugs; . . . can insulating sleeves . . . [and]

20

21

22          [3]In oral argument, ICANN also suggested that even if it does
23      accept an application for .WEB and allows a registry service to
        administer it, ICANN itself would not being using the term in
24      commerce.

25          [4]Under 15 U.S.C. § 1114(1), "Any person who shall, without the
        consent of the registrant- (a) use in commerce any reproduction,
26      counterfeit, copy, or colorable imitation of a registered mark in
        connection with the sale, offering for sale, distribution, or
27      advertising of any goods or services on or in connection with which
        such use is likely to cause confusion, or to cause mistake, or to
28      deceive; . . . shall be liable in a civil action by the registrant
        for the remedies hereinafter provided."

online retail store services featuring computer accessories."[5]
(RJN Exh. I.)  ICANN contends that the services it provides, would
provide, or would allow to be provided using .WEB are not related
to the goods and services covered by IOD's registration; ICANN
coordinates the Internet's DNS, accepts applications for TLDs, and
would allow the use of .WEB as a TLD, whereas IOD's registered mark
applies to mouse pads, backpacks, other accessories, and online
retail services.  "If the goods are totally unrelated, there can be
no infringement because confusion is unlikely."  AMF Inc. v.
Sleekcraft Boats, 599 F.2d 341, 348 (9th Cir. 1979).  Thus, ICANN
argues, there can be no infringement under this section.

IOD contends that ICANN does not perform the proper fact-
driven analysis to determine likelihood of confusion and that it is
not proper for the court to make such determinations at the motion
to dismiss stage.  (Opp. at 17.)  IOD contends that if such factual
analysis were to be conducted at this stage, "there is no
information in the record regarding whether the goods and services
offered under IOD's .WEB trademark are complementary, or sold to
the same or similar class of purchasers.  Further, there is no
information in the record regarding whether the products have a
similar use and function.  And, in this case, it is not obvious
whether the goods are complementary, or sold to the same class of
purchasers, or similar in use and function."  (Opp. at 17.)

"In an infringement suit, the plaintiff bears the burden of
proving likelihood of confusion, which exists when consumers

---

[5]IOD's trademark registration certificate can be considered
because it is critical to IOD's claims and is not subject to
reasonable dispute.  See Parrino, 146 F.3d at 706 and note 1 above.

viewing the mark would probably assume that the product or service

it represents is associated with the source of a different product

or service identified by a similar mark." Lindy Pen Co., Inc. v.

Bic Pen Corp., 725 F.2d 1240, 1243 (9th Cir. 1984)(internal

citations and quotation marks omitted). See also M2 Software, Inc.

v. Madacy Entertainment, 421 F.3d 1073, 1081 n.6 (9th Cir. 2005)

("The burden of proving likelihood of confusion [that is,

infringement] remains on the party charging infringement even when

relying on an incontestable registration")(internal citations,

quotation marks, and alterations omitted).

Here, IOD admits that it has presented no evidence of

likelihood of confusion.  It simply asserts in its Third Cause of

Action that the use of .WEB for registry service would be "likely

to cause confusion" with IOD's registered mark.  (Compl. ¶ 97.)

Since its registered mark is for computer and beverage accessories

and online retail services, whereas ICANN would use or allow use of

.WEB for TLD internet services, even taking the complaint in the

light most favorable to the plaintiff, the court cannot infer a

likelihood of confusion between the subject matter of the

registered trademark (mouse pads and backpacks) and the products or

services offered by ICANN (Internet DNS and TLD application

services).[6]

---

[6]In oral argument, IOD indicated that confusion was likely
because other TLD registry services also sell products on their
website.  IOD gave the specific example of VeriSign, the company
that operates the TLD .COM.  At the website www.verisign.com,
VeriSign sells products including cyber security products. IOD
offered this as an example of the reason why a consumer would be
confused if another company operated the .WEB registry service
while IOD still holds the trademark for .WEB for certain products.
However, the VeriSign site (www.verisign.com) nowhere uses ".COM"
(continued...)

**3. Trademark Claims under 15 U.S.C. § 1125(a)**

Under 15 U.S.C. § 1125(a), a plaintiff can recover for infringement of common law trademark.[7]  IOD asserts that it has  a common law trademark in the .WEB mark in connection with its registry services.  ICANN asserts that .WEB is a generic TLD that is not entitled to trademark protection. IOD states that it has a case before the Ninth Circuit,[3] pending since 2000, which will decide this issue, and that the court should stay the issue until that decision has been made.

---

[6](...continued)
as a trademark for the products and services it is selling; the mark involved appears to be VERISIGN.  This example therefore does not help IOD demonstrate a likelihood of confusion; it tends more to demonstrate the TLDs are generally not source indicators.

[7]
"(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which--
          (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or
          (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,
     shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act."
15 U.S.C.A. § 1125.

[3]Image Online Design, Inc. v. Core Association, 120 F.Supp. 2d 870 (C.D. Cal. 2000), appeal docketed, No. 00-56284 (9th Cir. July 2000).  The case appears to be in mediation.

1    This court agrees with ICANN[4] that the mark .WEB used in

2    relation to Internet registry services is generic and cannot enjoy

3    trademark protection.  "Throughout the development of trademark

4    law, the purpose of trademarks remained constant and limited:

5    Identification of the manufacturer or sponsor of a good or the

6    provider of a service."  <u>New Kids on the Block v. News America</u>

7    <u>Pub., Inc.</u>, 971 F.2d 302, 305 (9th Cir. 1992).  Many TLDs do not

8    have trademark significance since they do not serve as source

9    identifiers.  "[T]he primary reason that a consumer is likely to

10   associate a domain name with a source is that the <u>second-level</u>

11   domain indicator (in this case the 'advertising' component of

12   'advertising.com') is distinctive."  <u>Advertise.com,Inc. AOL</u>

13   <u>Advertising, Inc.</u>, 616 F.3d 974, 981 (9th Cir. 2010).  Thus, as the

14   Ninth Circuit has remarked that in the mark ADVERTISING.COM, "the

15   use of '.com' . . . only conveys the genus of the services offered

16   under AOL's mark," not the source of those services.  <u>Id.</u> at 982.

17   To convey the "genus" of the services is to be by definition a

18   "generic" mark.

19       The proposition that TLDs are not generally source indicators

20   has been adopted by courts, legal scholars, and other authorities.

21   <u>See e.g.</u> <u>Image Online Design, Inc.</u>, 120 F. Supp. 2d at 877 ("[A]

22   domain name ending in .web does not indicate source to a web site

23   customer.  A consumer understands source as it relates to web sites

24   through the second-level domain name.  Only second level domains

25   indicate source."); <u>In re Oppedahl & Larson LLP</u>, 373 F.3d 1171,

26   _____

27       [4]And with Judge Kelleher in <u>Image Online Design, Inc.</u>, 120
     F.Supp. 2d. 870.  The court recognizes that an appeal has been
28   pending since 2000 but finds the reasoning comprehensive and
     persuasive.

1173 (Fed. Cir. 2004) ("the term '.com' is a top level domain
indicator (TLD) without any trademark significance" and "'.com' has
no source-identifying significance."); McCarthy on Trademarks §
7:17.50 ("[A] top level domain indicator has no source indicating
significance and cannot serve any trademark purpose. . . . [T]he
TLD '.com' functions in the world of cyberspace much like the
generic indicators 'Inc.,' 'Co.,' or 'Ltd.' placed after the name
of a company."); and Trademark Manual of Examining Procedure 5th
Ed. (2007) § 1215.02 ("Generally, when a trademark, service mark,
collective mark, or certification mark is composed, in whole or in
part, of a domain name, neither the beginning of the URL
('http://www.') nor the TLD have any source-indicating
significance. Instead, those designations are merely devices that
every Internet site provider must use as part of its address.
Advertisements for all types of products and services routinely
include a URL for the web site of the advertiser, and the average
person familiar with the Internet recognizes the format for a
domain name and understands that 'http,' 'www,' and a TLD are a
part of every URL.").

     IOD points out that the USPTO has recognized that "as the
number of available TLDs is increased by [ICANN], or if the nature
of new TLDs changes, the examining attorney must consider any
potential source-indicating function of the TLD and introduce
evidence as to the significance of the TLD." (Compl. ¶ 36.)  It
asserts that "the function of TLDs as generally not being source
indicating is a relic of an essentially exclusive '.com.'" (Compl.
¶ 37.)  This may be the case.  For instance, if ICANN were to
introduce the TLD .APPLE, the user would arguably expect that that

1  TLD is administered by Apple Inc.  In such a case, the TLD might be
2  considered a source indicator.  If Sony tried to administer the TLD
3  .APPLE, Apple Inc. would likely argue and possibly prevail on a
4  trademark infringement claim.

5      This said, it appears to the court that today only the most
6  famous of marks could have a source indicating function as a TLD.
7  Some marks, such as .WEB, might remain generic even if they were
8  famous, since .WEB in connection with registry services for the
9  World Wide Web appears to refer to the service offered, rather than
10 to only a particular producer's registry service.  See
11 Advertise.com, Inc. v. AOL Advertising, Inc., 616 F.3d 974, 977
12 (9th Cir. 2010)(internal citations and quotation marks
13 omitted)("Generic terms are those that refer to the genus of which
14 the particular product or service is a species, i.e., the name of
15 the product or service itself.  To determine whether a term [is]
16 generic, we look to whether consumers understand the word to refer
17 only to a particular producer's goods or whether the consumer
18 understands the word to refer to the goods themselves.")

19     The court agrees with Judge Kelleher that the mark .WEB is not
20 protectable under traditional trademark analysis because it "seems
21 to represent a genus of a type of website" and thus answers the
22 question "What are you?" rather than "Who vouches for you?"  Image
23 Online Design, Inc. v. Core Ass'n, 120 F.Supp.2d 870, 879-80
24 (C.D.Cal. 2000).[5]  Because the purported mark .WEB used as a TLD is

25

26     [5]The court sees no reason to stay this decision pending the
27 resolution of Image Online Design, Inc., 120 F.Supp.2d 870, now
   before the Ninth Circuit. That appeal has been pending since 2000,
28 and the court is persuaded by the reasoning and holding of the
   district court opinion in that case.

generic, IOD cannot obtain common law trademark protection and therefore cannot state a claim for infringement under this section.

### 4. Contributory Infringement

"To be liable for contributory trademark infringement, a defendant must have (1) intentionally induced the primary infringer to infringe, or (2) continued to supply an infringing product to an infringer with knowledge that the infringer is mislabeling the particular product supplied." Perfect 10, Inc. v. Visa Intern. Service Ass'n, 494 F.3d 788, 807 (9th Cir. 2007)(internal quotation marks and citation omitted).  Because the court has found that IOD has not alleged any actual infringement and that the mark .WEB for registry services is generic, the contributory infringement claims also fail.

### C. Intentional Interference Claims

#### 1. Intentional Interference with Contract

"Under California law, a claim for intentional interference with contract requires: (1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of the contract; (3) defendant's intentional acts designed to induce breach or disruption of the contract; (4) actual breach or disruption; and (5) resulting damage." Family Home & Fin. Ctr. v. Fed Home Loan Mortg. Corp., 525 F.3d 822, 825 (9th Cir. 2008).

In its Sixth Cause of Action, IOD alleges the elements of intentional interference with contract as follows: (1) "IOD maintains contractual relationships with its customers, who purchased IOD's .WEB services, including the ability to register a domain name in IOD's .WEB registry"; (2) "ICANN knows that IOD has contracts with its customers to provide and manage domain names

1   that resolve in IOD's .WEB registry"; (3) "ICANN has intentionally

2   and knowingly interfered with IOD's existing customer contracts by

3   permitting other entities to apply for and operate a .WEB registry

4   in the Internet's primary DNS root system controlled by ICANN. . .

5   . [T]he inclusion of .WEB in the Internet's primary DNS root system

6   by ICANN will cause computer users searching for IOD's customers'

7   computers, to reach other computers instead"; (4) "ICANN's

8   acceptance of the seven $185,000 deposits, and ICANN's affirmations

9   that it intends to permit one or more of the new applicants to

10  operate the .WEB registry in the Internet's primary DNS root system

11  controlled by ICANN, has disrupted and interfered with, and will

12  continue to disrupt and interfere with, IOD's ability to fulfill

13  its contractual obligations to provide .WEB registry services to

14  its customers"; (5) "As a result of ICANN's intentional

15  interference with IOD's contractual relations, IOD has been damaged

16  in an amount to be determined at trial."  (Compl. ¶¶ 136-40.)

17      The court finds that these allegations are conclusory.  IOD

18  has not alleged any facts identifying the particular contracts, the

19  actual disruption of these contracts, or any actual damage to IOD.

20  IOD is alleging only that it has some contracts with customers for

21  its .WEB registry and that ICANN knows that it has some such

22  contracts. IOD cannot simply allege that ICANN has interfered with

23  its business model; for this tort, it must allege actual

24  interference with actual contracts, such that the result is a

25  specific breach, not merely general damage to the business.  IOD

26  has pointed to no case law, nor has the court discovered any, that

27  allows for such claims of generalized disruption of contracts.

28

## 2. Intentional Interference with Prospective
## Economic Advantage

To state a claim for intentional interference with prospective economic advantage, IOD must allege "(1) an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentional acts on the part of the defendant designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm to the plaintiff proximately caused by the acts of the defendant." Pardi v. Kaiser Foundation Hospitals, 389 F.3d 840, 852 (9th Cir. 2004), quoting Korea Supply Co. v. Lockheed Martin Corp., 29 Cal.4th 1134, 1153 (2003). "[T]he third element also requires a plaintiff to plead intentional wrongful acts on the part of the defendant designed to disrupt the relationship" Korea Supply Co., 29 Cal. 4th at 1154.

As discussed above, IOD has failed to allege facts to support the five elements of intentional interference with prospective economic advantage. Additionally, because the court has found that IOD has not stated a claim for trademark infringement, the court also finds that IOD has not pled any intentional wrongful acts on the part of ICANN.

1    The court therefore finds that IOD has failed to state a claim

2  for intentional interference with contract and with prospective

3  economic advantage.

4  **IV. CONCLUSION**

5    For the reasons stated above, the Motion to Dismiss Complaint

6  is GRANTED.

7  IT IS SO ORDERED.

8

9

10  Dated: February 7, 2013

11                                  DEAN D. PREGERSON
                                    United States District Judge

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28